IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**MICHAEL J. FITZPATRICK, ROSS**            Civil Case No. 3:11-CV-00553-KI
**DIETERLE, and DAVID FAHEY**,

                                                              OPINION AND ORDER
                         Plaintiffs,                ON SUMMARY JUDGMENT

        v.

**FARMERS INSURANCE EXCHANGE, a**
**foreign insurance exchange**,

                         Defendant.


        Travis W. Hall
        Bateman Seidel Miner Blomgren Chellis & Gram P.C.
        888 SW Fifth Avenue, Suite 1250
        Portland, OR 97204

                Attorney for Plaintiff Michael Fitzpatrick


Page 1 - OPINION AND ORDER ON SUMMARY JUDGMENT

Judy Danelle Snyder
Law Offices of Judy Snyder
1000 S.W. Broadway, Suite 2400
Portland, OR 97205

     Attorney for Plaintiffs Ross Dieterle and
     and David Fahey

Timothy Snider
Ryan Gibson
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204

     Attorneys for Defendant.


KING, Judge:

Plaintiffs Michael J. Fitzpatrick, Ross Dieterle, and David Fahey bring suit against

Farmers Insurance Exchange for violations of the Age Discrimination in Employment Act under

26 U.S.C. § 626, et seq., the Oregon statutory counterpart under ORS 659A.030, as well as a

claim for whistleblower retaliation under ORS 659A.199. Pending before me is Farmers'

Motion for Summary Judgment [42]. For the following reasons, I grant summary judgment and

dismiss plaintiffs' claims with prejudice.

## BACKGROUND

All three plaintiffs worked in Farmers' Salem Branch Claims Office, in the Auto Physical

Damage group, where they were responsible for adjusting auto insurance claims made on

damaged cars. Plaintiffs Fitzpatrick and Dieterle were supervisors; each supervised about four to

six claims representatives. Plaintiff Fahey worked under Dieterle as a claims representative. The

office was managed by Randy Voth.  Voth reported to Jared Hansen, the Field Claims Manager

for Oregon.  Hansen reported to the Director of Northwest Claims, Gil Wiseman, until April

2009, after which he reported to Todd Dettner.  Wiseman and Dettner reported to Linda Nelson,

the Vice President of Claims Field Operations for the Pacific Zone.  The hierarchy is denoted in

the following chart:



Farmers also had a Human Resources department, staffed by Cheryl Hartley in Oregon,

who reported to Michael Bartalo, HR Business Partner, in Colorado Springs.

Plaintiff Dieterle was terminated on February 9, 2009 (he was about 30 years old).

Plaintiff Fahey was terminated on March 30, 2009 (he was 46 years old).  Plaintiff Fitzpatrick

was terminated on May 4, 2009 (he was 53 years old).  Dieterle alleges Farmers terminated his

employment in retaliation for opposing age discrimination.  Fitzpatrick and Fahey allege they

were terminated due to age discrimination.  Farmers says it terminated the employees for violating its policies.

I discuss the facts in more detail below, but for purposes of context, Farmers announced in late 2008, during the recession, that it was planning a reduction in force in its Auto Field Claims operations and that it intended to use "performance management" to do so.  Fitzpatrick understood "performance management" to mean the company would "progressively discipline employees that are underperforming or having conduct issues that may need to be addressed and rectified."  Fitzpatrick Dep. 61:18-21.

Between January and March 2009, Farmers conducted several audits of its offices in the Northwest region, including Oregon.  One of the audits, which was not initiated by anyone in plaintiffs' management chain, was of a database called the Customer Restoration Network, which creates electronic claims files.  The audit report showed several employees had checked a box called the "SIU flag."  If the SIU flag was checked, it meant the claim was under investigation for fraud.  A separate department, called the Special Investigations Unit ("SIU"), reviewed and investigated the fraud.  Farmers' policy was that the SIU flag should only be checked if fraud indicators were present on the claim and it was referred to SIU for investigation.  Farmers later changed the policy so that only SIU employees could check the SIU flag.  Importantly, checking the SIU flag meant that the customer would not receive a customer satisfaction survey because the customer would be investigated for insurance fraud.  Normally, customer satisfaction surveys are generated electronically once the claim is paid and closed.  Farmers expected high performance scores on customer satisfaction surveys, so even one negative survey could affect an employee's performance review and compensation.  Supervisors' performances were also scored

Page 4 - OPINION AND ORDER ON SUMMARY JUDGMENT

based upon surveys on claims handled by the representatives each supervised.  Dieterle was terminated as a result of this audit, as was Fitzgerald.

The other relevant audit Farmers conducted examined the hours worked by the claims representatives, who are hourly, non-exempt employees under state and federal law.  Again, this audit was not requested by anyone in plaintiffs' management chain.  Claims representatives are expected to work a set schedule and to record their time online; if they need to work overtime, they must obtain approval from their supervisors.  The audit reflected computer activity undertaken after hours.  Fahey was terminated as a result of this audit.

Following the audits, Farmers closed multiple offices around Oregon.  Salem's office, in which all three plaintiffs worked, was closed in August 2011.

Plaintiffs contend that 34-year-old Hansen, the Field Claims Manager for Oregon, made ageist comments about Fahey, and that Hansen used the opportunity presented by the reduction in force to terminate plaintiffs.  Hansen had been promoted to the Field Claims Manager position in March of 2007.  Before his promotion, he had worked in the Salem office where, in 2005, he had supervised plaintiff Fahey, four years before plaintiffs were terminated.  At that time, Hansen reportedly referred to Fahey in staff meetings as being unable or unwilling to change because he was older, and told Dieterle not to work with Fahey because Fahey had not "been able to adjust to the way" Hansen wanted things done.  Dieterle Dep. 32:19-20.  Hansen was particularly unhappy about Fahey's use of paper files and his unwillingness to use email in the way Hansen wanted.  Fahey believed Hansen thought Fahey was not willing to change because he was an older person; Fahey believed Hansen denied him the training he needed to advance and denied him a promotion.  Plaintiff Fitzpatrick also overheard Hansen talk about Fahey in a disparaging

way; three to four times a year, Hansen would refer to Fahey as "a dinosaur," "being older," "not

adapting to change," "not being able to keep up with the world," "that he was older, that he was

not capable of change."  Fitz. Dep. 37:7-38:18.

I summarize below the summary judgment motion as to each plaintiff.

## LEGAL STANDARDS

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an

employer to hire or discharge any individual or otherwise discriminate against any individual

with respect to compensation, terms, conditions, or privileges of employment, because of the

individual's age.  29 U.S.C. § 623(a)(1); ORS 659A.030(1)(a) (unlawful to "bar or discharge the

individual from employment" "because of" age).  Protection under the ADEA extends to all

individuals who are at least 40 years old.  29 U.S.C. § 631(a).

The order and allocation of proof in cases under Title VII of the Civil Rights Act applies

to age discrimination claims under the ADEA, as well as to claims under ORS chapter 659A,

which may be proven by direct or circumstantial evidence.  Enlow v. Salem-Keizer Yellow Cab

Co., Inc., 389 F.3d 802, 812 (9th Cir. 2004); Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d

1080, 1090-03 (9th Cir. 2001).  The burden shifting procedures are detailed below, but generally

require plaintiff to establish a *prima facie* case of discrimination, creating a rebuttable

presumption that the employer unlawfully discriminated against the plaintiff.  The burden of

production then shifts to the employer to identify a legitimate reason for its action.  In response,

plaintiff must offer enough evidence to raise a genuine issue of material fact as to whether the

employer's reason is merely pretext for discrimination.  Nidds v. Schindler Elevator Corp., 113

F.3d 912, 917 (9th Cir. 1996); <u>Dominguez-Curry v. Nevada Transp. Dep't</u>, 424 F.3d 1027, 1037

(9th Cir. 2005).

**DISCUSSION**

I.    <u>Plaintiff Dieterle</u>

Plaintiff Dieterle brings two claims:  one alleging Farmers terminated his employment

because he complained about age discrimination, in violation of ORS 659A.030(1)(f), and one

alleging a claim under Oregon's new private employer "whistleblower" statute, under

ORS 659A.199.  His claims arise out of a conversation he had with his supervisor, Randy Voth,

in which he raised concerns about Farmers' treatment of plaintiff Fahey's performance review.

With respect to both alleged statutory violations, Farmers contends Dieterle's complaint

must be dismissed as a matter of law because (a) he has not met his *prima facie* case; (b) Farmers

has a legitimate, nondiscriminatory reason for terminating Dieterle's employment; and

(c) Dieterle cannot identify specific and substantial evidence to show Farmers' reason is pretext.

Moreover, with respect to the new private employer "whistleblower" statute only, Farmers argues

the statute does not apply retroactively to the alleged conduct.

With respect to both claims, Dieterle must make a *prima facie* case.  Specifically, he must

prove the following:  (1) he engaged in protected conduct by opposing or reporting unlawful

discrimination; (2) he suffered an adverse employment action; and (3) there is a causal

connection between the protected activity and the adverse action.  OAR 839-005-0124; <u>Boynton-</u>

<u>Burns v. Univ. of Oregon</u>, 197 Or. App. 373, 380, 105 P.3d 893 (2005); <u>Poland v. Chertoff</u>, 494

F.3d 1174, 1179-80 (9th Cir. 2007).

The requisite degree of proof necessary to establish a *prima facie* case on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.' . . . Establishment of a prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Id. (citations omitted).

A.    Protected Conduct

Plaintiff Dieterle became plaintiff Fahey's supervisor in October 2007. He had just begun supervising Fahey when he learned that Fahey's performance rating had been downgraded, meaning Fahey was no longer entitled to a pay increase. Dieterle met with Fitzgerald (Fahey's previous supervisor) and Voth, and they all agreed the downgrade was not appropriate. Dieterle understood Voth approached Hansen about it and Fahey's performance rating was changed from a "partially meets" to a "meets expectations." Dieterle Dep. 46-47. Dieterle understood it was Hansen that gave Fahey a better score.

Dieterle learned in late 2008 that Fahey's evaluation from the year had again been downgraded from an "exceeds expectations" to a "meets expectations." When Dieterle discovered the downgrade, and that the data used to assign the performance rating were incorrect, Dieterle again brought it to Voth's attention. Accordingly, the alleged "protected conduct" occurred as follows:

> Q. All right. Now, did you ever -- did you ever tell Randy Voth that you believed that Mr. Fahey's 2008 performance review was age discrimination?
>
> **A. I brought up to Randy Voth during that that this was kind of like the same thing from 2007 and that I felt that Jared [Hansen] was discriminating**

**against Dave [Fahey] because of his -- Jared's feelings that Dave was a -- a -- inable to -- unable to adapt to changes at Farmers, that he was set in his ways of doing things.**

Q. So what did you -- what -- can you tell me, if you recall, what you actually said to Randy Voth?

**A. Essentially, that's the conversation that we had.**

Q. That you –

**A. We discussed those things and I said, I respect Jared, but I absolutely disagree with what's being done in this performance rating, and it should be what is reflected right here.**

Q. Did you tell Randy Voth that you believed that the numbers were the way they were because Jared Hansen felt David Fahey was set in his ways?

**A. I -- yes. I did have that conversation with Randy Voth.**

Q. In -- in this time period when you're talking about performance reviews?

**A. That I felt that -- that he was unfairly targeting Dave and that the numbers weren't accurate. I felt that had something to do with the fact that he basically did -- didn't feel Dave was capable of being an exceeds employee because he was -- as Jared saw it, was set in his ways.**

Q. Right. Did you say that -- did you tell Randy that -- or Mr. Voth that you believed Mr. Hansen's conclusions on Mr. Fahey were because of Mr. Fahey's age?

**A. I -- I think I stated "set in his ways." He'd been doing it a certain way for so long was...**

Q. But you didn't tell Mr. Voth that you believed Mr. Hansen was engaging in age discrimination against Mr. Fahey?

**A. I don't know that I used the term specifically -- or specifically phrased it that way.**

Q. I'm sorry. What?

**A. I don't think I specifically phrased it that way.**

Page 9 - OPINION AND ORDER ON SUMMARY JUDGMENT

Dieterle Dep. 60:16-62:9.

Farmers argues this is not protected conduct and I agree.  The statements must have put Farmers on notice that Dieterle was complaining about protected conduct and, in this context, Dieterle's comments were too vague to be an explicit or implicit allegation of age discrimination. See Delgadillo v. Fiesta Palms, LLC, No. 2:09-cv-1772-LDG-GWF, 2011 WL 1067305, at *4 n.2 (D. Nev. Mar. 21, 2011) (statements must be specific enough to put employer on notice; complaints about unfair treatment insufficient) (citing unreported Ninth Circuit cases); see also Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3rd Cir. 1995) (letter complained about unfair treatment in general).  Dieterle's statements did not put Voth, or anyone else at Farmers, on notice that Dieterle was opposing age discrimination.  Voth testified that Dieterle never complained to him about age discrimination at any time, and Dieterle admitted in his deposition that he never told Voth he believed Hansen was engaging in age discrimination.

Dieterle characterizes his conversation as "resist[ing] a decision which was motivated by age based animus" but, as Farmers points out, this is just a characterization of the conversation. Pls.' Op. Mem. 17.  Further, as Voth notes,

> it was customary for FCSs, like Dieterle, to lobby for higher performance scores
> for the CRs they supervised.  In addition to simply wanting to advocate on behalf
> of their CRs, FCSs also had a professional and financial incentive to maximize the
> performance numbers for the CRs they supervise, since FCS performance and, by
> extension, compensation, was closely linked to the performance of their CRs.

Voth Decl. ¶ 8.  Furthermore, a description of someone being "set in his ways" could refer to someone of any age.

Dieterle relies on three cases to attempt to meet this factor, but in all of the cases the protected nature of the conduct was apparent.  In Crawford v. Metropolitan Government of

Page 10 - OPINION AND ORDER ON SUMMARY JUDGMENT

Nashville and Davidson County, Tenn., during a company-initiated investigation into sexual harassment, the employee reported "sexually obnoxious behavior toward her by a fellow employee[.]" 555 U.S. 271, 276 (2009). Similarly, in EEOC v. Willamette Tree Wholesale, Inc., the court held that it was protected conduct for a plaintiff to yell "Knock it off" when he saw another employee behaving lewdly toward his sister. CV 09-690-PK, 2011 WL 886402, at *11 (D. Or. Mar. 14, 2011). Finally, in Merrill v. MITCH Charter School, plaintiff requested paid maternity leave, which she said resulted in termination of her employment. CV 10-219-HA, 2011 WL 1457461, at *7 (D. Or. Apr. 4, 2011). Again, the protected nature of the conduct was obvious. In contrast, Dieterle's single statement that a performance review was unfair, complaining that the lower rating was motivated by a belief that the employee was "set in his ways," is not an explicit or implicit report of age discrimination.

     B.    Causal Connection

Even were I to find, however, that Dieterle's conduct constituted protected conduct, Dieterle fails to meet his burden in showing a causal connection between his termination and the protected conduct. Dieterle was terminated as a result of an audit conducted for the entire Western and Pacific Zones; no one in Dieterle's direct management chain ordered the audits. Although Hansen was part of the team who investigated the audit results–which reflected that Dieterle personally checked the SIU flag on four separate claims, that claims representatives he supervised had checked the SIU flag on several other claims, and that Hansen recommended termination–there is no evidence Hansen knew about the alleged protected conduct. It is undisputed Voth played no role in the termination decision, although he agreed with it.

According to Dieterle's own testimony, he did not know whether Voth ever spoke with

Hansen about Fahey's performance rating, or whether Hansen ever knew Dieterle was advocating

for Fahey.

Specifically, Dieterle testified as follows:

**A.  Whenever I had my conversation with Randy Voth, I told him that those
numbers [he] had [for Fahey]–were not–were not accurate. . . . They had
been altered.**

Q.  . . . And what was his response?

**A.  Well, he asked me to bring up the scorecard so he could look at it again,
and I showed him.  And I said, Here they are.**

   **And then he said, Well, I'm going to go back to Jared and – regarding
that.**

Q.  And do you know if he went back to Mr. Hansen?

**A.  I don't know specifically that he did.  He told me he was going to go back
and have that conversation.**

Q.  Okay.  Do you know, did Mr. Voth come back and report to you what
happened afer that, after any such conversation?

**A.  Not specifically.  I actually followed up with Randy Voth regarding it on
multiple occasions, What is the status of getting this changed to what it
should be?**

. . . .

Q.  And you went back to Mr. Voth several times on this?

**A.  Multiple times, yes, yeah.**

Q.  And what was his response when you asked questions?

**A.  I'll have to follow up with him again or, I'm waiting to hear back, those
kind of . . .**

Q.  What was the resolution of this issue?  How did it resolve?

**A.  It didn't resolve.**

Q.  Did Mr. Voth ever report back to you that–that Mr. Hansen had made [some] sort of decision –

**A.  No.**

Dieterle Dep. 58:6-59:17.

Hansen testified, "Voth never told me that Dieterle had ever complained to him about the treatment of Fahey, and I had no knowledge that Dieterle ever had done so."  Hansen Decl. ¶ 28.

Voth testified he remembered Dieterle requesting a higher rating for Fahey, but

> [a]t no time did Dieterle ever tell me that he believed Fahey was being treated unfairly or receiving lower performance review scores because of his age. Dieterle certainly never told me that he believed Mr. Hansen, or anyone for that matter, was taking action with respect to Fahey's performance review because of his age, or even any words remotely to that effect.  Because Dieterle never made any such statements to me, I never reported any such statements to Mr. Hansen or anyone else.

Voth Decl. ¶ 9.

Dieterle suggests a trier of fact could infer Hansen knew about his protected conduct because Voth told Dieterle he had spoken with Hansen about Fahey's performance rating.  But Farmers has provided undisputed testimony from Voth and Hansen that the topic never came up. Accordingly, there is no basis on which a trier of fact could find Hansen knew about Dieterle's protected conduct.

Dieterle also relies on his testimony that when Dieterle discussed his employees' performance numbers with Voth, for coaching or training opportunities, Voth purportedly told Dieterle that he would have to change Fahey's numbers because Hansen would contest the

numbers and Voth did not want to be put on the spot in front of the other managers.  On multiple

occasions, Dieterle believed Voth changed Fahey's performance numbers.  Dieterle Dep. 80:16-

81:20.  This testimony, however, only undermines Dieterle's theory that Voth spoke with

Hansen; if Voth was willing to change Fahey's numbers unfavorably to avoid a confrontation

with Hansen, it is all the more likely he avoided a confrontation with Hansen about Fahey's

performance rating.  Finally, the fact that a similar issue arose with respect to Fahey's 2007

performance rating, and that Voth actually did speak with Hansen about it, and that Hansen

actually did change Fahey's performance rating, further undermines Dieterle's view of the

evidence.  Dieterle Dep. 46-47; Gibson Supp. Decl. Ex. A, FARMERS001994.

Dieterle also contends that the timing of the events supports his theory.  Dieterle alleges

his protected conduct occurred in January 2009, so that only a few weeks had elapsed before his

employment was terminated on February 9, 2009.  This time range could support an inference of

retaliation.  However, "[i]n some cases, the totality of the facts may form such a clear picture that

a district court would be justified in granting summary judgment, either for or against a plaintiff,

on the issue of retaliatory motive[.]"  Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir.

2003).  Here, even assuming Hansen was the only decision maker, Dieterle has failed to meet his

burden when there is no evidence Hansen knew about Dieterle's protected conduct.  See, e.g.

Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (employer knowledge of protected

conduct is circumstantial evidence to prove causation); cf. Staub v. Proctor Hosp., 131 S. Ct.

1186, 1194 (2011) (describing "cat's paw" theory that a biased negative statement from a non-

decision maker could taint the employment decision).

Since there is no evidence Hansen or anyone else involved in Dieterle's termination knew about Dieterle's protected conduct, Dieterle's termination could not have been in retaliation for that protected conduct.  Since Dieterle has failed to make his *prima facie* case, I do not reach the question of pretext or the retroactive application of ORS 659A.199.

C.    Conclusion

Farmers' motion for summary judgment is granted as to Dieterle's claims.

II.    Plaintiff Fitzpatrick

Fitzpatrick alleges he was terminated due to age discrimination under federal and state law.  ORS 659A.030(1)(a) & (b); 26 U.S.C. § 626, et seq.  Like Dieterle, Farmers says it terminated Fitzpatrick for improperly checking the SIU flag.  Hansen and Hartley investigated the audit which showed Fitzpatrick had improperly checked the SIU flag twice.  Fitzpatrick, in an interview, acknowledged it was improper to check the SIU flag when claims were not referred to SIU for investigation, without fraud indicators, and to avoid a negative customer satisfaction survey.  In the interview, he could not remember checking the SIU box on one of the claims, but thought there were fraud indicators.  He checked the SIU box on the other claim because it was related to an initial claim that had previously been referred to SIU; he did not refer it to SIU because he thought another supervisor had done so.  After the interview, Hansen reported to Todd Dettner, Hansen's supervisor and Wiseman's replacement, that one of the claims had no legitimate fraud indicators and was never referred to SIU, and the other, although it had a legitimate fraud indicator, was also never referred to SIU and the customer was upset.  Hansen Ex. W, at 2.  Hansen attached his interview notes.  Dettner agreed, and Nelson approved the termination.  Hartley reported her findings to Bartalo in HR, who also recommended termination.

Of these decisionmakers, only Hansen was under 40 at the time of the termination decision.  In the HR department, Bartalo was 43 years old and Hartley was 60.  Dettner was 45 and Nelson, the ultimate decisionmaker, was 46 years old.

A.    *Prima Facie* Case

To establish a prima facie case of age discrimination, Fitzpatrick must produce enough evidence at summary judgment for the trier of fact to infer the fact at issue.  The elements are that plaintiff:  (1) was a member of the protected class (age 40-70); (2) was performing the job in a satisfactory manner; (3) was discharged; and (4) was replaced by a substantially younger employee with equal or inferior qualifications.  Nidds, 113 F.3d at 917.  Again, as with Dieterle, the burden on Fitzpatrick is minimal.

For purposes of this motion, there is no question on the first, third and fourth factor that Fitzpatrick has met his *prima facie* burden.  With respect to the second factor–whether Fitzpatrick was performing his job in a satisfactory manner–the parties dispute the appropriate time frame at which job performance is measured.  Farmers contends I must consider Fitzpatrick's performance at the time of the termination, primarily relying on a Seventh Circuit case.  Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002).  Fitzpatrick contends that the "second element of the prima facie case makes sense only when it is limited to the time period prior to the introduction of the alleged unlawful discrimination."  Bahri v. Home Depot USA, Inc., 242 F. Supp. 2d 922, 931 (D. Or. 2002); Culver v. Qwest Communications Corp., 05-CV-1720-HU, 2007 WL 963446, at *8 (D. Or. Mar. 23, 2007) ("The question is whether the incident occurred against a backdrop of previously documented poor or unsatisfactory performance."), aff'd, 306 F. App'x 403 (9th Cir. 2009).

I agree with Judges Stewart and Hubel that the broader employment history is relevant in determining whether Fitzpatrick has met his very minimal burden.  Looking at the facts in the light most favorable to Fitzpatrick, he had worked for Farmers for 17 years and had never received a negative counseling memorandum or other progressive discipline prior to April 14, 2009.  He had received spot bonuses, volunteered for extra duties, received exceptional performance evaluations, and was well-regarded by his co-workers.  In late 2008 or early 2009, his performance review was "exceeds expectations" and he received a $7,622 performance increase to his base salary for 2009.  Although Farmers contends that, at the time he was terminated for clicking the SIU flag on two files, Fitzpatrick had received a formal written warning Last Chance agreement, a 30 day counseling memorandum, and a second Last Chance Agreement–Formal Warning and Suspension, all of these events occurred within a three-week time period; the initial discipline occurred on April 14 and he was terminated on May 4.  Given the very minimal burden on Fitzpatrick, and considering his entire 17-year distinguished career at Farmers, I find he has established a *prima facie* case of discrimination.

B.      Pretext

Fitzpatrick disagrees that Farmers terminated him for nondiscriminatory reasons, but concedes for purposes of burden shifting that Farmers has given a facially legitimate explanation.

The next question, then, is whether Fitzpatrick can offer evidence demonstrating Farmers' reason for terminating Fitzpatrick was pretextual.

1.      Direct Evidence

There is no direct evidence Farmers terminated Fitzpatrick because of his age–"[d]irect evidence is evidence which, if believed, proves the fact of discriminatory animus without

inference or presumption." <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1221 (9th Cir. 1998). (citation and brackets omitted). Even assuming Hansen's comments all referred to Fahey's age, as opposed to his naturally inflexible personality, none of the comments related to Fitzpatrick, and Hansen made all of them four years before Fitzpatrick was terminated and in a context unrelated to Fitzpatick's termination. <u>See id.</u> (stray remarks unconnected with termination are insufficient). Additionally, Fitzpatrick points to the testimony of Tom Litsey, an attorney representative in the Salem office, who agreed with the statement that "there was an age bias in claims operations in Oregon when Mr. Jared Hansen was the state claims manager." Litsey Dep. 798:18-24. Litsey worked in a different department entirely from Fitzpatrick and, moreover, he could give no reasons to support his opinion.

Fitzpatrick next contends an incident in January 2006 "reflected a culture of age animus" at Farmers. Pls.' Mem. 30. The incident, which occurred three years before he was terminated, involved alleged age discrimination Fitzpatrick reported as a result of a comment made by an Executive Assistant to the Director for a different Farmers entity in charge of marketing, sales and business services. The woman who made the comment, Paula Michels, told Fitzpatrick that Farmers did not want to hire older people but younger people Farmers could mold. This is not evidence of Farmers' age animus for a number of reasons. First, Michels worked as an administrative assistant in another corporate entity entirely, and she made the comment three years before Fitzpatrick was terminated. With respect to the content of her communication, she testified she made the comment as a joke and she clarified she did not think younger candidates had a better chance of being considered for openings than did older workers. Finally, HR investigated the comment and gave Michels a verbal warning.

Finally, Fitzpatrick asserts other older managers were targeted in the reduction in force ("RIF").  As an initial matter, the only individual involved in his termination decision that Fitzpatrick alleges was discriminatory was Hansen; Fitzpatrick makes no argument any of the other four were discriminatory, and all of them were in Fitzpatrick's protected age class; Fitzpatrick was 53, while Hartley was 60, Dettner was 45, Nelson was 46, and Bartalo was 43 years old.  Goberman v. Wash. Cnty., No. CV-00-581-ST, 2001 WL 34045881, at *9 n.6 (D. Or. Apr. 26, 2001) (when decision maker close in age and within protected category, inference of discrimination is diminished).  Additionally, Farmers points out that the two older managers who Fitzpatrick suggests were affected by the RIF–Voth and Wiseman–*voluntarily* resigned or transferred during 2009.  Even taking as true Fitzpatrick's assertion that Voth resigned because he believed he could no longer succeed at Farmers, a supposition which could be subject to question based on his testimony, the fact is the evidence presents no "stark pattern" of age discrimination in reducing staff in 2009.  See Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 663-64 (9th Cir. 2002); Voth Dep. 15:1-7; 44: (explained he retired; it "was time" because he wasn't clear on travel expectations; formal warning "had a lot to do with it").

> 2.    Indirect Evidence

Fitzpatrick may, alternatively, "come forward with circumstantial evidence that tends to show the employer's proffered motives are not the actual motives because they are inconsistent or otherwise not believable."  Godwin, 150 F.3d at 1222.  Such evidence must be "specific and substantial in order to create a triable issue with respect to whether the employer intended to discriminate on the basis" of age.  Id.

Fitzpatrick asserts that Farmers' explanation is internally inconsistent or not believable because he had performed well up until 2009, Hansen used progressive discipline as a way to reduce staffing levels, and that others who were substantially younger than Fitzpatrick were spared termination.

I assume, for purposes of this motion, that Hansen had control over the investigation and that his recommendation carried weight with the other decision makers.  However, as an initial matter, there is no evidence Hansen, or any of the other individuals involved in the termination decision, had anything to do with the audit.  As a result, Fitzpatrick's conduct prior to the audits is simply not relevant to his ultimate termination because Farmers did not learn of any improper conduct until 2009.

Furthermore, and importantly, Fitzpatrick is unable to show similarly situated, younger employees who engaged in similar conduct were not terminated.  Vasquez v. Cnty. of LA, 349 F.3d 634, 641 (9th Cir. 2003) ("A showing that the [employer] treated similarly situated employees outside [employee's] class more favorable would be probative of pretext.").  The only true comparator was Dieterle—who was also terminated, and who is much younger than Fitzpatrick.

The difference between Fitzpatrick and the three other younger employees who were not terminated was that Farmers believed the other employees had not checked the SIU flag to avoid a negative customer satisfaction survey, but that Fitzpatrick had.  Specifically, with respect to Brad McKinney, the notes in the claim file indicated McKinney found fraud indicators, there were in fact indications of fraud, and he intended to refer it to SIU but forgot.  Notably, "There were no indications in the claim file that the customer was unhappy with how" the employee had

handled the claim.  Hansen Decl. ¶ 36.  Similarly, with respect to Mahesh Giri, the claim had

legitimate fraud indicators, the employee reported he had intended to report the claim to SIU, and

there were no indications the customer was unhappy.  Id. at ¶ 29.  Finally, with respect to Derek

Radaford, there were fraud indicators, the claim had actually been referred to SIU, and SIU was

actively investigating.  Further, he "self-reported."  Id. at ¶ 37.  In contrast, "there were delays

and other customer service issues, suggesting there was a motive for Fitzpatrick to check the SIU

flag to avoid a negative customer satisfaction survey."  Id. at ¶ 33.  Fitzpatrick does not dispute

this fact.

Fitzpatrick challenges that the stated reason for his termination was simply marking the

SIU box without referring the claim to SIU, but it is apparent from the interview notes that he

knew precisely what Farmers was concerned about.  Hansen Ex. W, at 3 (volunteered repeatedly

that the SIU box should never be checked to avoid a survey).

Finally, Fitzpatrick clearly felt justified in marking the SIU box and the statements he

makes about his honesty are credible.  However, for purposes of this motion, it matters not

whether Fitzpatrick actually intended to avoid a customer satisfaction survey.  What matters is

whether Farmers "honestly believed its reason for its action, even if its reason is 'foolish or

trivial or even baseless.'"  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir.

2002).  Fitzpatrick has presented no evidence that Farmers did not honestly believe its reason for

terminating Fitzpatrick.  In sum, the evidence, even viewed in the light most favorable to

Fitzpatrick, is insufficient to allow a reasonable jury to find that Farmers' reason for terminating

him was pretextual for age discrimination.

III.    David Fahey

In contrast to the other plaintiffs, Fahey was terminated for violating overtime and timecard policies.  Fahey's violations were discovered in an audit, which was not undertaken by anyone supervising him.  Hansen and Wiseman were tasked with investigating violations discovered by the audit.  Hartley was also involved.  Hansen worked with Fitzpatrick and Voth to investigate the five claims representatives (including Fahey) believed to be in violation.  During an interview on March 30, 2009, Fahey acknowledged working outside normal work hours without approval and without reporting the time on his timecard.  He acknowledged his conduct violated Farmers' written policies.  Hansen recommended termination, Wiseman agreed, and Nelson approved.  Hartley separately recommended termination, and Bartalo approved.  The other claims representatives with documented violations were also terminated (two were under 40 and two were over 40).

I assume, for purposes of this motion, that Fahey has met his *prima facie* burden, but I also find Farmers has produced a legitimate, nondiscriminatory reason for terminating his employment.  In order to avoid summary judgment, Fahey must establish pretext, either directly or indirectly.

Although he provides no factual analysis in his response to Farmers' summary judgment, presumably he rests on Hansen's comments in 2005 when Hansen was supervising him.  There is no other direct evidence Farmers terminated Fahey because of his age.  Even assuming Hansen's comments all referred to Fahey's age, as opposed to his inflexible personality, comments made more than four years before termination are insufficient direct evidence to rebut pretext.  See Godwin, 150 F.3d at 1221 (stray remarks unconnected with termination are insufficient).

Page 22 - OPINION AND ORDER ON SUMMARY JUDGMENT

Furthermore, Fahey has failed to come forward with specific and substantial evidence that Farmers' given reason for the termination is not believable.  He challenges the fairness of the overtime policy and whether it was properly communicated, but he cannot show that Farmers treated similarly situated employees differently than it treated him.  When the four other Oregon claims representatives who violated the overtime policy (two of whom were under 40 years old) were also terminated, and when five people agreed termination was appropriate (four of whom were over 40), Fahey cannot show Farmers' reason for terminating him was pretext and that its true motive was age discrimination.

The evidence, even viewed in the light most favorable to Fahey, is insufficient to allow a reasonable jury to find that Farmers' reason for terminating him was pretextual.  As a result, Farmers' motion for summary judgment is granted as to Fahey's claims.

## CONCLUSION

For the foregoing reasons, Farmers' Motion for Summary Judgment [42] is granted and the complaint is dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____17th_____ day of December, 2012.


___/s/ Garr M. King_____
Garr M. King
United States District Judge